The Judges pronounced their opinions.
JUDGE TUCKER.
This is a case arising upon the construction of our law of descents, and of distribution of personal estate; where an infant of the age of thirteen years died possessed of real and personal estate derived from his father; leaving a mother, (and other relations on the mother’s side, as it would seem,) but no brother, or sister, whatever, nor any descendant from them.
A preliminary question, however, arises from the following circumstances. The infant, Edward Steptoe, died in May, 1794. His mother administered upon his estate, and entered into possession of the whole, both real and personal. A part of the present plaintiffs, uncles and aunts on the part ot the father, or descendants from them, brought their bill against the mother for a division of the estate, claiming the whole. In her answer she states, that she had 360 been advised *she had a right to her son’s personal estate; and, if so, some of her near connections may be benefited by it: which seems to shew she had near relations who were no parties to the suit. On the 17th of March, 1797, Mr. Wythe, then Judge of the High Court of Chancery, pronounced his decree, whereby he decided that the complainants had no right to the slaves, or personal estate, and dismissed the bill as to the part thereof which claimed the same, and demanded an account of the administration thereof. But, being of opinion that the complainants were entitled to the lands, he directed partition thereof to be made among them in certain proportions, and appointed Commissioners to state an account thereof, and to settle and adjust an account of the profits, since the death of the infant Edward Step-toe, to be reported to the Court. But, before any farther proceedings were had, Elizabeth Steptoe, the mother, died, having made a will, and appointed the appel *142 lant, Templeman, her executor; and William Steptoe, another defendant, having also died, the suit abated as to both those original parties.
After the division of the High Court of Chancery into Districts, (the act for which passed in January, 1802,) the present complainants filed a bill (the date of filing which does not appear) in the Williamsburg Chancery District Court; in which they speak of the former decree as interlocutory, and still amendable by the Court, and therefore pray that they may have the benefit of all the proceedings in the original suit, except the said interlocutory decree, which, as they are advised, ought to be set aside, partly for error apparent on the fa.ce of it, and partly because the execution of certain parts of it has become impossible; and pray process of subpoena to revive and answer against the appellant Templeman, as executor of Elizabeth Steptoe. One of the suggestions in this bill, which states that William Steptoe died in April, 1803, shews that the filing of the bill was after that period, so that more than six years elapsed 361 ^between the time of pronouncing the first decree, and the preferring the present bill.
To this bill Templeman, the executor of the mother, after disclaiming any connection with the real estate, pleads the decree of March, 1797, as a final decree in bar of the claim to the slaves and personal estate, and account of their hires, since the death of his testatrix, or of the administration of his testatrix on the personal estate of her husband, George Steptoe, deceased, &c.; and insists on the length of time, and acquiescence of the plaintiffs under that decree.
The replication to that plea denies that the decree of March, 1797, was final, in any respect, but says nothing of the lapse of time or acquiescence under the decree.
In November, 1805, the cause was heard before the Chancellor of the Williamsburg District, who pronounced a decree overruling the defendant’s plea; and declaring that, neither the mother, though alive at the death of her son, nor any relations on her part, were entitled to any share or proportion of the infant’s estate, real or personal, and directing that the whole should be distributed among the complainants, as heirs on the part of the father, in the several proportions therein mentioned, together with an account, &c. in order to a final decree.
From this decree the defendant Temple-man prayed, and obtained an appeal to this Court, by virtue of the act of 1797, c. 5, authorizing the High Court of Chancery, in its discretion, to grant appeals from interlocutory decrees. Before which period no appeal could be granted until a final decree.
The counsel for the appellees contend, that the original bill having been dismissed, as to the personal estate, by the decree of March, 1797, that decree was final as to that matter; and that the plaintiffs were barred by length of time from filing a bill of review.
If the premises be correct, I think the conclusion must be so too. For the utmost period within which an appeal from 362 *a Superior Court of Chancery to this Court lies, seems to be three years, as was fully discussed in the cases of Tomlinson v. Dilliard, and Mackey v. Bell(a) By analogy, then, I should suppose that a bill of review would not lie after that period. For that would be granting moré po'wer to the Judge of the same Court to reverse the decrees (pronounced by his predecessor perhaps) than the law vests in this Court. Instead of resorting to the period assigned to writs of error at common law, I think it far more reasonable that the period which the law has assigned to appeals from the Courts of Chancery be adopted as that which bars a bill of review. In England the statutory law is silent as to appeals from the High Court of Chancery. Therefore, the analogy to writs of error at common law was adopted. But our law having assigned a period within which appeals in Chancery must be brought, that period appears to me the proper standard by which the granting of bills of review should be governed. It is unnecessary, I conceive, to consider how far the saving in favour of infants might operate: the analogy must be observed throughout; and, if any of the parties were infants, their case is provided for.
But the counsel for the appellants insist that the decree was not final, but merely interlocutory, and therefore still in the breast of the Court. The inconveniences of such a construction were most ably commented upon, and illustrated by the opposite counsel. They are such as, in my opinion, to deserve not only the attention of the Courts, but of the Legislature. That a decree of dismission, which in its nature seems conclusively to determine every question of right, after being acquie'sced in for six years, should be liable to be set aside by the successor of the Judge who pronounced it, and thereby affect, perhaps, the rights of bona fide purchasers for a valuable consideration, actually paid, upon the principle that they were purchasers pendente lite, seems so far repugnant to every idea that I have of justice, or equity, that I cannot well imagine a case that would call more loudly for legislative aid and 363 protection, if the offended ^dignity of Courts should pronounce against the claim of such bona fide purchaser. But that case is not before us, and I hope never will be, though not unlikely to happen very frequently, if the practice he permitted to prevail; which it certainly ought not, so as to affect others, now that the law allows appeals from interlocutory decrees. In the present case, however, as the law stood at the time the decree was pronounced, no appeal lay; for, however cogent the arguments to the contrary appear in my ej'es, I am constrained by former precedents to say that the decree of March, 1797, was not a final decree between the parties, all of whom were still retained in court, although the bill, as to a part of the subject claimed, was dismissed, (b) The succeeding bill is, therefore, to be taken as a bill of revivor and supplement, by which the cause was *143 brought regularly before the Judge who pronounced the second decree.
By that decree, as I have already noticed, the Chancellor decided that, neither the mother of the infant, nor any relations of the infant, on the part of the mother, were entitled to any portion of his estate, real or personal.
That decision, so far as it respects the mother herself, or any of her descendants, other than children by the father of the infant, or their descendants, appears to me to be perfectly correct. But I differ with the Chancellor so far as respects the father or mother of the mother, or any of her collateral relations, all of whom, in the events which have happened, appear to me '(if in being at the time of the infant’s death) to be entitled to a portion of his estate, real and personal.
The following principles appear to me not to require any argument, or authority, in support of them.
1. That the laws of descent, or rules of succession ab intestato, to property real or personal are merely creatures juris positivi.
2. That, by the act of 1785, c. 60, all former rules and canons of inheritance and succession to estates real and personal within this Commonw'ealth, whether 364 established by *the common law or by statute, were entirely rescinded, abrogated and annulled: and that they cannot be revived in any manner, but by some express legislative provision for that purpose. (a)
3. Thai, if, by any subsequent act, any case provided for by the act of 1785 shall now happen not to be provided for, the legislature only is competent to provide for such omitted case, (b)
4. That the case of an infant having lands by descent or purchase from his father, already deceased, dying in the lifetime of the mother, and leaving no child, nor brother, nor sister, nor any descendant from either of them, was fully provided for by the fourth section of the act of 1785, c. 60.
5. That the same happens now not to be provided for, by the operation of the act of 1792, c. 93, s. 5. The law declaring only that, in such case, the mother shall not succeed to the same: without designating any other person or persons to whom the succession shall belong during the life of the mother: neither the seventh section of that act, nor any subsequent part thereof, providing for the succession in any such case.
From these principles, as premises, it appears to me that, in the case above supposed, (which is the same with that before the Court,) the succession to the inheritance during the life of the mother was in abeyance; and that, at her death, the whole estate, real and personal, ought to go to the same persons, and in the same proportions, as the same would have descended, if there had been no mother, nor brother, nor sister of the infant, nor any descendant from either of them, at the time of the death of the infant. And, consequently, that, after the death of the mother, the estate, both real and personal, ought first to be divided into two moieties, one of which moieties ought to be allotted to the plaintiffs in the several proportions, by which the Chancellor in his decree has directed that the whole shall be allotted; and that the other 365 moiety be reserved for the benefit *of those relations on the part of the mother (of which by her answer to the original bill it appears probable there were some living at the time of the infant’s death) who may within a reasonable time assert and prove their claims thereto. But if no such relations on the part of the mother shall assert their claim within a reasonable time, to be limited by the Court of Chancery, that the other moiety be then divided among the plaintiffs in the same proportions as the former.
It also appears to me, that, as no person was capable of succeeding to the inheritance as heir, during the life of the mother, the account of rents and profits, subsequent to the death of the infant, ought not to be decreed to be taken for that period which elapsed between the death of the infant and the death of his mother. The inheritance, during that period, being, as I have already said, in abeyance, the first occupant, who might enter and possess himself thereof during that period, might, as I conceive, lawfully hold the same, and take the rents, issues, and profits thereof to his own use, so long as the mother lived, without being in any manner chargeable or accountable for the same to the persons to whom the succession may belong, after the mother’s death.(c)
My opinion, therefore, is, that so much of the Chancellor’s decree as is in opposition to these principles be reversed, and that a decree conformable thereto be now made: and that the remainder of the decree be affirmed.
To prevent any misconception of this opinion, I beg leave to add that, if there had been any brother or sister of the infant on the part of his father living at the time of his death, or any descendant from them, such brother, sister, or their descendants, would have been entitled to take the estate immediately, notwithstanding the mother was then also living; as, in such a case, the inheritance would not have been in abeyance for a moment.
*JUDGE ROANE).
With respect to the first question made in this case, I consider it as the established doctrine of the Court that a decree of the inferior Court is not to be considered as final, until the cause is completely dismissed therefrom. Until that is the case, the Court below has, itself, the power to correct any errors it may have committed, and any decree it tnay have rendered is, therefore, not to be considered as final. Most of the arguments now used on this topic have been used and overruled on former occasions.
As to the question now made upon the act of descents, I believe it will be admitted that I have borne my testimony* against *144 the policy which gave rise to the act of 1790, restoring, in a measure, the feudal principle of the blood of the first purchaser. But, while I shall never be in favour of extending that principle in doubtful cases, by construction, I do not deny the power of the Legislature to make the innovation. The question before us is then purely a question of construction upon the intention of the Legislature as manifested in the act itself.
No man can be more sensible than I am, of the impropriety of extending the construction of an act by mere implication; especially to further an odious or unjust principle; but I apprehend that an implication may be so strong and necessary as to be equivalent to an - express declaration by the Legislature. This I take to be the case in the present instance. The exclusion of the mother in the event that there is a brother or sister on the part of the father, or a brother or sister of the father, is substantially* equivalent to an express declaration that the persons last mentioned shall tnemselves succeed; and -this the rather, as the first section of the act of descents purports to provide a rule of inheritance as to all cases, and which idea is entirely supported by the opinion of this Court in the case of Brown v. Turberville. I consider that decision as a complete 367 authority *to overrule the idea that the inheritance is in abey'ance in the case before us. The succession in this case, therefore, does not rest upon a mere naked implication, but upon an implication so strong and necessary, (all the circumstances considered,) as to be equivalent to an express declaration by the Legislature. In this last respect this case differs from the one put in a note to 2 Tuck. Bl. App. p. 33, where an elder child being disabled from inheriting’ by receiving a popish education, and the statute which disabled him (1 Jac. I.) containing no declaration who should have the land, a subsequent statute was deemed necessary to be made in favour of the next of kin.
It is a sound rule of construction that, if it can be prevented, no clause, sentence, or word, shall be rendered superfluous, void, or insignificant, (a) In the case before us it is difficult to say wherefore the brothers and sisters on the part of the father, and e converso, were mentioned in the act, but for the purpose of following up the principle on which the change of the rule was founded, and giving the estate to them, instead of the excluded parent.
Upon the whole, my. construction of the act of 1792 is, that it is entirely similar to that of 1785, with the single” exception of the amendment made by the act of 1790; (which is kept up and extended by the 5th and 6th sections of the act of 1792;) and that those sections operate by way of exception from the general law in the cases put therein, as well by substituting one heir, as excluding another. The error on this point seems to be in considering the canons of the act of 1785 as still in force, (for example, in, favour of the paternal grandfather and maternal grandmother,) while at the same time the succession is changed, in a particular case, in favour of the maternal uncles and aunts, &c. As to the justice of this alteration, the power o^ the Legislature being admitted, we are' compelled to say “stet pro ratione voluntas.”
I therefore concur with the Chancellor in his construction *in the present instance, which is* also that of the public at large, and thereby avoid the great evil (as almost all infants derive their property either on the part of the father or the mother) which would result from deciding that, in cases like the present, no-rule of descent is provided by law, and that the estates are, consequently, in every instance, to be considered as in abeyance.
JUDGE) FLEMING.
The counsel for the appellant, in their statement, rested the cause on two points cnly:
1st. That the original decree was right; and,
2d. That the bill having been dismissed as to the personal estate, the decree was final as to that matter; and the plaintiffs were barred by length of time from filing a bill of review.
The cause was argued with great ability on both sides, but much the greater part of the arguments of the appellant’s counsel seemed predicated on the assumption of facts which, in my apprehension, did not exist; to wit, that the decree of March, 1797, was final; and that the bill against Templeman, as executor of Elizabeth Step-toe, was a bill of review. In order to prove that the decree of 1797 was final, it was strenuously argued that there ought to have been two separate and distinct suits p one for the real, and the other for the personal estate: but, for what good purpose there should have been more than one suit, I am at a loss to discover. The counsel proceeded to argue that, as the Chancellor decided the right, respecting the personal estate and dismissed the bill, as to that subject, the decree was final: but this Court has never considered a decree to be final, so long as the parties remained in Court; but every order and decree made during that space, has been considered as interlocutory, and subject to revision; as in the cases of Young v. Skipwith,(b) Grymes v. Pendleton, (c) and M’Call v. Peachy. (d) In the former case, Skipwith brought his bill against Young for the moiety of a tract of land, according to contract. The Chancellor decreed for the plaintiff a moiety 369 *of the land, (which completely decided the rights of the parties,) and appointed a Commissioner to make a partition accordingly. Young appealed to this Court, which, after a long and solemn argument on the merits of the cause, decided unanimously that the decree was interlocutory, dismissed the appeal, and remanded the cause to the High Court of Chancery ; as was likewise done in the cases of Grymes v. Pendleton, and M’Call v. Peachy, noticed above: and in several subsequent cases, after the act of January, 1798, allowing' appeals (by the Court of Chancery) from interlocutory decrees; particularly, in the *145 cases of the President and Professors of William and Mary College v. Lee’s Executors, and of Fairfax v. Muse’s Executors, (a) In the latter case, there was a decree to foreclose the equity of redemption of mortgaged lands, and the premises ordered to be sold: yet this Court unanimously dismissed the appeal, as having been improvidently allowed, in vacation, from an interlocutory decree; which was not authorized by law. And, had an appeal been allowed, in the case before us, from the decree of March, 1797, there is not a doubt on my mind hut it would have been dismissed, as having been prematurely granted. Considering that decree then as interlocutory, and not final, the argument, that a bill of review was barred by length of time, falls to the ground. But, in my apprehension, it is not a bill of review, but a bill of revivor and supplemental bill, which the several deaths of Elizabeth and William Steptoe, who were the executrix and executor of George Steptoe, deceased, made necessary, in order to bring the whole subject in controversy properly before the Court; and in which the widow, and the children of William Steptoe, (eight in number,) were made parties, plaintiffs; and who, by the last decree, are made distributees of one fourth part of the estate of the said Edward Steptoe, deceased, the widow’s dower therein being first allotted to her; all which appears to me • to have been correct and proper.
As to the length of time that the appellees acquiesced in, and left undisturbed, the decree of March, 1797, it may be 370 *well accounted for. The Commissioners appointed, by that decree, to state an account of the real estates whereof the said Edward Steptoe died seised, and to settle and adjust the profits of the said estate, since his death, had made no report of their proceedings, before the deaths of the said Elizabeth and William Steptoe, when the bill of revivor, and supplemental bill, because necessary for the purposes aforesaid. I come now to consider the cause on its merits, and to decide, according to the best of my judgment, the rights of the parties to the estate of Edward Step-toe, deceased, under our several acts of Assembly. And here a difficulty seems to arise, anda difference of opinion among the judges, respecting the exposition of those acts; which circumstance, and the very ingenious arguments of the counsel, induced me to consider the subject with more than ordinary attention; and, after the most mature deliberation, the difficulty to me appears easiljr solved, by giving to those acts such a construction as I conceive to have been the sense and intention of the Legislature, at the several periods when they were passed; and, as I believe, agreeably to the general sense and understanding of the community at large.
It was objected by the appellees’ counsel, though not much relied on, that the fifth clause of the act of 1792, under which the appellees claim, is only a proviso, or an exception, to the general principles, words, and meaning of the preceding clauses; and ought not to have the same force and effect as if it had been declaratory, and an enacting clause.
Our first act of Assembly, altering the course of descents from that of the common law, was passed in the year 1785; in which the sense of the Legislature was expressed, in general terms; as it was likewise in the 24th section of the act of distribution,, passed the same session, and referring to the act of descents, for the distribution of goods and chattels: but, in the year 1790, an important change was made, in cases of infants dying without isuse; and, by an. act passed the 24th of December, in that year, entitled “An act to amend the act entitled an act directing the course 371 of descents,” it is ^enacted (section 3,) that, “where an infant shall die without issue, having title to any real estate of inheritance, derived by purchase or descent from the father, the mother of such infant shall not succeed to, or enjoy the same, or any part thereof, by virtue of the said recited act, if there be living any brother or sister of such infant, or any brother or sister of the father, or any lineal descendant of either o£ them:” in which act there is another clause, vice versa, excluding the father, &c. where the estate is derived from the mother. In the same act there is a repealing clause in the emphatic words following: “So much of all acts as comes within the purview of this act, and particularly of the act entitled an act directing the course of descents,” (viz. the act of 1785,) “shall be, and the same is hereby repealed.” The above clauses, respecting cases of infants dying without issue, are declaratory and explicit, and not exceptions to clauses of general import. It is true that, when they are incorporated into the act of 1792, “to reduce into one the several acts directing the coarse of descents,” they are there inserted as. said provisoes to the general course of descents in the preceding clauses; with the exclusion of any issue which the mother may have by any person, other than the father of such infant ; which latter exclusion was not in the act of 1790: and so in the clause excluding the father, &c. from inheriting any estate derived from the mother.
But it is contended, in the present case, that the 5th clause of the act of 1792, which excludes the mother from the inheritance, is in negative words, and no express declaration who shall inherit the estate; and therefore it is a casus omissus; and, during the life of the mother, the estate was in abeyance, there being no person in existence capable of inheriting; as the infant died, leaving neither brother nor sister; and that, on the death of the mother, (there being no provision for the case in the act of 1792,) so much of the act of 1785 as directs that the inheritance shall be divided into moieties, one of which shall go to 1he paternal, and the other to the maternal kindred, is revived, and in force; (the course of descents by the common law being-372 *done away by the statutes; and it being a rule, that a statute cannot be repealed by implication.) But we have already seen that the act of 1785, so far as it was within the purview of the act of 1790, which completely embraced, and, in my *146 conception, provided for, the case before us, was repealed in as express terms as language could devise.
And, further, in the act of 1792, directing the course of descents, there is a clause declaring that all and every act and acts, clause and clauses of acts heretofore made, containing any thing within the purview of this act, shall be, and the same are hereby repealed. The act, then, of 1785, or so much thereof as was within the purview of either the act of 1790, or the act of 1792, was clearly repealed. And it is a rule of equal force with the one mentioned above, that a statute once repealed shall not be revived by implication. There is also another important rule of construction that well applies to the case before us; which is, that force and efficacy is to be given to every sentence, and significant word, in a statute, which does not contradict or obscure some other part of the same statute; and that,' where words or expressions are ambiguous, and of doubtful meaning or effect, such interpretation and application shall be given them, as to fulfil the object and intention of the Legislature, if the will of the Legislature can be fairly deduced from such words or expressions. And here let me premise that, in my conception, the Legislature intended to provide, and hath provided, for every possible case that could happen, (and such was the sense of all the Judges in giving their opinions in the case of Brown v. Turberville,) and, particularly, is there provision made for the one now under consideration ; and others of a similar nature; and that, as Edward Steptoe died under age, and without issue, having an estate of inheritance derived by purchase from his father, neither his mother, nor any issue which she might have had by any person, other than his father, could succeed to, or inherit, any part thereof: and, as there was no brother nor sister of the said Edward Steptoe, nor descendants of such, living at the time of his death, the 373 brothers '"and sisters of his father George Steptoe, deceased, and their descendants, (the present appellees,) have a right to the inheritance; which I conceive to have been clearly the will and intention of the Legislature; or why was the mother, and any issue which she might have by any person other than the father, excluded from the inheritance, “so long as there should be living any brother, or sister of the father, or any lineal descendant of either of them?” To give the latter words any other construction would, to my mind, render them nugatory, and so many dead letters: and they are certainly of too important signification to be thus considered. And I construe them on the principle that a devise of lands to a son, after the death of his mother, gives to the mother an estate for life by implication.
I am therefore of opinion, that the decree is correct, and ought to be affirmed; and (the decree being interlocutory) the cause remanded to the Superior Court of Chancery of the District of Williamsburg, for farther proceedings to be had therein.
By the majority of the Court, decree affirmed, and cause remanded for farther proceedings.

 3 H. & M. 199—217.

 Grymes v. Pendleton 1 Call, 54.

 See Acts of 1789, c. 9.

 See 1 T. R. p. 52.

 See Tucker's Blackstone, vol. 3, App. p. 28 — 42, i or the reasons a,t large upon which this opinion is lounded.

In the two decisions in the case of Tomlinson v. Dilliard, &c.

 6 Bac. 380.

 2 Wash. 300.

 1 Call, 54.

 Ibid. 55.

 2 H. & M. 557, and note (2), 558.